UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Micron Technology, Inc. Securities Litigation | Case No. 19 Civ. 678 |
| | Hon. William H. Pauley III |

**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

Lead Plaintiff Thomas Fish ("Plaintiff"), by his undersigned attorneys, hereby bring this Amended Consolidated Class Action Complaint ("Complaint") against Micron Technology, Inc. ("Micron" or the "Company"), Sanjay Mehrotra ("Mehrotra"), Ernest E. Maddock ("Maddock"), and David A. Zinsner ("Zinsner") (collectively, "Defendants"). Mehrotra, Maddock, and Zinsner are collectively referred to as the "Individual Defendants." The allegations herein are based on Plaintiff's personal knowledge and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of Lead Counsel, which includes a review of: U.S. Securities and Exchange Commission ("SEC") filings by Micron; securities analysts' reports and advisories about the Company; press releases and other public statements issued by the Company; media reports about the Company; and interviews of former employees of Micron and other persons with knowledge of the matters alleged herein. Lead Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. On behalf of himself and the class he seeks to represent, Plaintiff alleges as follows:

## I.  NATURE OF THE ACTION

1.     This is a class action on behalf of persons and entities that acquired Micron securities between September 26, 2017 and November 20, 2018, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Micron manufactures memory chips for computers, smartphones, servers, and similar end products. Most of the Company's revenue is generated from dynamic random access memory ("DRAM") products. Micron is one of three dominant players in the DRAM market, along with

Samsung and SK Hynix, that collectively account for 95% of sales. In addition, Micron's most important market is China.

3.      Throughout the Class Period, Micron touted the strength of its DRAM business, reporting strong revenue growth and profit margins fueled by steeply escalating prices for DRAM products. What Micron failed to disclose, however, was that the price increases were artificially produced by collusive behavior among Micron, Samsung, and SK Hynix. These supposed competitors collectively agreed not to increase DRAM supply capacity in response to rising prices, but instead maintain supply discipline so as to perpetuate an undersupply of DRAM product. This anticompetitive conduct successfully caused DRAM prices to consistently rise from the middle of 2016 through the end of 2017. In response to these rising prices, Micron's customers stockpiled DRAM product to mitigate against future price increases.

4.      In response to this unprecedented bull market in DRAM products, at the end of 2017, China's regulatory authorities began to investigate anticompetitive conduct in the industry. As the Chinese government began its probe in earnest, the DRAM cartel broke ranks and began to increase capacity in 2018, leading to a moderating of prices. This, in part, caused DRAM purchasers to cease its stockpiling. In addition, demand for DRAM products started to soften in 2018. Quite suddenly, an oversupply of DRAM became a global glut—a foreseeable consequence of Micron's anticompetitive conduct and the regulatory response that it provoked.

5.      The price of Micron's stock declined significantly in response to a series of partial corrective disclosures that revealed to the market that (i) there was substantial evidence in support of collusion among Micron and its erstwhile, and (ii) once collusion had ended, DRAM prices moderated and Micron's DRAM customers stopped stockpiling product, leading to an inventory overhang that would take three quarters to bleed off.

## II.    JURISDICTION AND VENUE

6.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

7.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa(a).

8.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this District.

9.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

10.    Lead Plaintiff Thomas Fish purchased Micron securities during the Class Period. Plaintiff suffered a loss of approximately $2, 416, 078 as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

11.    Defendant Micron Technology, Inc. is incorporated under the laws of Delaware with its principal executive offices located at 8000 South Federal Way, Boise, ID 83707. Micron is a holding company for subsidiaries engaged in the design and production of computers, semiconductor devices, including DRAM, flash memory, USB flash drives, and solid-state drives. Its consumer products are marketed under brands such as Crucial and Ballistix. Micron is a global corporation and has manufacturing facilities in various locations including China and Japan. During the Class Period, Micron and its subsidiaries manufactured, sold and distributed their products throughout the world, including the United States. The Company's operations are managed in four segments: Compute and

Networking Business Unit which includes memory products sold into computer, networking, graphics, and cloud server markets; Storage Business Unit which includes products sold into enterprise, client, cloud, and removable storage; Mobile Business Unit which includes memory products sold into smart phone, tablet, and other mobile-device markets; and, Embedded Business Unit which includes memory products sold into automotive, industrial, connected home, and consumer electronics markets. Micron's common stock trades on the NASDAQ exchange under the symbol "MU."

12.     Defendant Mehrotra has been the President and Chief Executive Officer ("CEO") of the Company since May 8, 2017. Prior to joining Micron, he was President and CEO of SanDisk. During the Class Period, Mehrotra signed Micron's annual reports and quarterly and annual certifications pursuant to the Sarbanes-Oxley Act of 2002. He participated in the Company's quarterly earnings conference calls described herein. Mehrotra was a direct and substantial participant in the fraud.

13.     Defendant Maddock was the Chief Financial Officer ("CFO") of the Company from June 2015 to his resignation in February 2018. He was also the Senior Vice President of the Company from June 23, 2017 to his resignation in February 2018. Prior to joining Micron, Maddock was the Executive Vice President and CFO at Riverbed Technology, where he was responsible for worldwide operations and information technology. During the Class Period, he signed Micron's annual reports and quarterly and annual certifications pursuant to the Sarbanes-Oxley Act of 2002. He participated in the Company's quarterly earnings conference calls described herein. Maddock was a direct and substantial participant in the fraud.

14.     Defendant Zinsner has been the Senior Vice President and CFO of the Company since February 19, 2018. Prior to joining Micron, he was the President and Chief Operating Officer at

Affirmed Networks. During the Class Period, Zinsner signed Micron's annual reports and quarterly and annual certifications pursuant to the Sarbanes-Oxley Act of 2002. He participated in the Company's quarterly earnings conference calls described herein. Zinsner was a direct and substantial participant in the fraud.

## IV.   CONFIDENTIAL WITNESSES

15.   CW1 was Micron's Corporate Vice President of global supply chain from August 2012 through June 2018. During the relevant time period, he reported to the Executive Vice President of worldwide operations, Manish Bhatia ("Bhatia"), who in turn reported to the CEO.

16.   CW2 was Micron's Vice President and Chief Strategist in the NAND solutions group from August 2013 through April 2015.

17.   CW3 was Micron's Vice President of the storage business unit from March 2014 through August 2017.

18.   CW4 was employed by Micron in various roles from September 2005 through April 2018, including as a manager in Micron's operations project management office from May 2016 through April 2018.

19.   CW5 was Micron's Senior Director of new production introduction from July 2016 through May 2018.

20.   CW6 was employed by Micron in various roles from 1999 through February 2019, including as a Manager of global sales enablement from September 2016 through February 2019.

21.   CW7 was a Deputy Director in Ministry of Commerce for the People's Republic of China until early 2019.

## V.   CONTROL PERSON ALLEGATIONS

22.   Each of the Individual Defendants, by virtue of their high-level positions with Micron, directly participated in the management of the Company, were directly involved in the day-

to-day operations of the Company at the highest levels, and had access to the adverse undisclosed information about the Company's business, operations, financial statements and present and future business prospects via access to internal corporate documents. The Individual Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.

23.     The Individual Defendants, as senior executive officers of Micron, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. The Individual Defendants had access to and were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance and/or had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

24.     As senior officers and controlling persons of a publicly-held company whose common stock was, during the relevant time, registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to Micron's operations and business, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

25.     In making the statements complained of herein, the Individual Defendants, who were senior officers and controlling persons of Micron, were acting on behalf of the Company in the regular course of business. Therefore, each of the statements made by the Individual Defendants is attributable to Micron.

## VI.     SUBSTANTIVE ALLEGATIONS

### A.     Micron's Business

26.     Micron and its consolidated subsidiaries design, manufacture and sell high-performance memory and storage technologies, including DRAM and flash memory, used in products around the world, including in the United States. Micron's technologies are used in a variety of markets including computing, networking, server applications, mobile, embedded, automotive and industrial designs.

27.     Micron was founded in 1978 as a semiconductor design company. The Company grew significantly over the years as a result of a three-way merger, creation of two major joint ventures with Intel, and numerous acquisitions. As of October 2018, Micron touted itself as "the touted world's fourth-largest semiconductor company, with the broadest portfolio of memory and storage solutions in the industry," employing over 34,000 people in 17 countries globally with nearly 40,000 patents contributed over the course of its 40-year history.

28.     A significant portion of Micron's wholly-owned facilities are located outside the U.S., in locations including Singapore, Taiwan, Japan, and China. Micron also purchases a significant portion of its equipment and supplies from outside of the U.S. and many of its top customers are located outside the U.S. In 2018, 88% of Micron's sales were to customers located outside the U.S. and 50% of Micron's revenue was generated by China.

29.     Since Micron became a publicly traded company in 1990, it has acquired numerous other corporations that design, manufacture and sell semiconductor, memory and flash products.

Several of those major acquisitions included Chinese and Japanese companies such as Inotera, Elpida Memory, and Powerchip. By aggressively acquiring other large companies in its industry and integrating them into Micron's umbrella, the Company was able to consistently generate significant growth in sales. Micron's acquisition strategy involved vertically integrating processes such as technology development, initial pilot line production, high-volume wafer manufacturing, and complex component assembly and test all in the same region. Micron's strategy was essentially to monopolize the industry.

30.     The market for Micron's key product, DRAM, has become increasingly consolidated over the years. While in 1980 there were over 20 different suppliers of DRAM, now just three suppliers, including Micron, account for about 96% of the market share. The market for DRAM is largely inelastic because there are no close substitutes for it. It is very difficult for new entrants to succeed in the heavily consolidated DRAM market because its three main suppliers, including Micron, own the requisite intellectual property and DRAM development requires costly, large scale, specialized manufacturing processes.

31.     Up to two-thirds of Micron's revenues have come from DRAM, the biggest driver of its business. The growth of the DRAM segment was fueled by demand from the cloud, enterprise, mobile, and graphics end-markets. During its fiscal year 2018, Micron reported that sales of its DRAM products rose 64%, with average selling prices rising by 35% and volumes growing 20%.

32.     DRAM is one of the most common forms of semiconductor memory. DRAM is used to store bits of data in capacitors, which are situated within integrated circuits. DRAM is widely used in digital electronics, such as in mobile phones, PCs and servers, tablets, TVs, cameras, and also in industrial applications, such as in automotive, military and aviation devices. DRAM is one of the most common forms of semiconductor memory. DRAM is used to store bits of data in capacitors,

which are situated within integrated circuits. DRAM is widely used in digital electronics, such as in mobile phones, PCs and servers, tablets, TVs, cameras, and also in industrial applications, such as in automotive, military and aviation devices.

33.     Micron manufactures DRAM in fabrication plants, commonly called "fabs." DRAM is made from silicon wafers, which are cut into individual chips called "dice," which are then printed with electronics. Capacity for DRAM is often discussed in terms of new "wafer starts."

34.     DRAM is classified into categories based on its end-use. For example, PC DRAM is used in PC-related products; mobile DRAM is used in mobile devices; and server DRAM is used in server applications.

35.     Micron sells the vast majority of DRAM to OEMs, which then incorporate DRAM into the manufacturing of DRAM-containing products. Micron primarily sells DRAM pursuant to contracts with DRAM buyers, with the remainder sold on the spot market.

36.     Micron is also increasingly reliant on its business in China. The Company's revenue from Chinese customers rose 67% in 2018 and accounted for 57% of its total sales, compared to 51% in 2017 and 43% in 2016.

A.     **Micron's Anticompetitive Conduct**

1.     **DRAM Market's Susceptibility to Collusion**

37.     The structure and characteristics of the DRAM market are conducive to collusive, anticompetitive behavior. The DRAM market has many of the key traits typically found in highly-cartelized markets, including: (1) DRAM is a commodity product—*i.e.*, interchangeable with other goods of the same type.; (2) the DRAM market is highly concentrated; (3) the DRAM market has high barriers to entry; (4) demand for DRAM is inelastic—*i.e.*, there are no close substitutes for DRAM products; and (5) the DRAM market experienced steep price increases that cannot be explained by rising costs or the introduction of new technologies.

38.    In the 1980s there were over 20 DRAM manufacturers. By 2012, that number had fallen to fewer than 11 manufacturers. And by 2018, the industry had become dominated by three companies—Micron, Samsung, and SK Hynix—which collectively accounted for 96% of worldwide DRAM market share. Micron by itself had a 23% market share, while Samsung had 46% and SK Hynix had 27%.

39.    Intellectual property poses a formidable barrier to entry for new market players. The DRAM industry is marked by a number of patents, a significant number of which are cross-licensed among Micron, Samsung, and SK Hynix. Their partnerships and alliances for technology and capacity help secure their market power and render market entry more difficult.

40.    There was also an ease of information sharing amongst the key players through an industry reporting mechanism, DRAMeXchange, and common participation in trade associations and other industry groups.

41.    From the middle of 2016 through the end of 2017, the primary types of costs that could have explained rising DRAM prices—namely, silicon wafer prices, research and development costs, and capital expenditures—remained fairly stable.

42.    Although the introduction of a new technology can explain price increases, the current DRAM technology, DDR4 was well into its life cycle. Because DDR4 was introduced in 2014, long before the price increases began in the middle of 2016, the transition from DDR3 to DDR4 cannot be used to explain the price increases.

**B.    Collusive Conduct by Micron, Samsung, and SK Hynix**

43.    Describing the DRAM industry, CW3 stated that it was in the three main players' collective self-interest not to oversupply the market. Each player had a huge financial motivation to get the other players not to add capacity. But this only happens by sharing information. There is an

"unnatural balance of power" in the industry, creating "an almost unnatural desire to try to collaborate with your enemies."

44.     Global DRAM prices had been rising since June 2016 and continued to rise through the end of 2017 because supply grew well below demand. According to DRAMeXchange, the average selling price of DRAM increased by more than 40% from the beginning to the end of 2017. However, Micron, Samsung, and SK Hynix were collectively restrained in making the capital expenditures to expand supply capacity, instead focusing their investments on technology transitions and process optimizations.

45.     Data from DRAMeXchange shows that, during the bull market, the top three suppliers each significantly increased their operating margins to 50-70%, the highest levels on record. Moreover, for the first time, the profitability of DRAM exceeded that of application processors, a special kind of microprocessor that is more technically advanced than DRAM.

46.     From the middle of 2016 until the end of 2017, deviating from past business practices, Micron, Samsung, and SK Hynix, which collectively controlled approximately 95% of the DRAM market, decided to limit capacity expansion such that supply more slowly than demand. As shown by their public statements throughout this period, the companies consistently signaled their joint agreement on this course of action. As a result, from the middle of 2016 until the end of 2017, DRAM spot prices skyrocketed nearly 350%—unprecedented in the history of the industry.

47.     As DRAM prices escalated throughout 2017, Micron, Samsung, and SK Hynix maintained their collective supply and capacity discipline for purposes of keeping supply growth below the forecasted demand growth, which further fueled price increases.

48.     The supposed competitors reassured one another that they would avoid competing against each other for market share by maintaining an undersupply of DRAM.

49.     During Micron's earnings call for the third quarter of 2017 on June 29, 2017, the Company stated that total DRAM bit growth "would be between 15-20%," which was below its view of demand growth. Samsung and SK Hynix subsequently made similar statements that supply growth would be lower than demand growth.

50.     During an investor conference on August 7, 2017, Defendant Mehrotra reiterated Micron's view that industrywide DRAM bit supply would grow in the 15-20% range, as compared to demand growth exceeding 20%.

51.     During Micron's earnings call for the fourth quarter of 2017 on September 27, 2017, Defendant Mehrotra stated, "we intend to grow aligned with industry over the course of these multiyear periods." Samsung and SK Hynix subsequently made similar statements that their supply growth would be in line with, or below, industry.

52.     After steadily falling for most of the past three decades, the price-per-bit of DRAM chips rose 47% in 2017. As the three companies entered 2018, they sought to keep prices at 2017 levels by keeping DRAM supply in check. For example, according to TrendForce, wafer start volumes for the three companies was expected to expand only 5-7% in 2018.

## C.     China's Investigation

53.     China is the largest importer of memory products, consuming approximately 20% of the world's DRAM. In addition, China is the biggest smartphone manufacturer. Chinese OEMs were among the most negatively impacted by the DRAM price hikes because they operated at lower profit margins compared to their competitors.

54.     On December 22, 2017, the PRC National Development and Reform Commission ("NDRC") held a meeting with Samsung representatives. During this meeting, the regulator expressed concerns about Samsung's role in the continuing price increases for memory products.

55.     It was reported that the meeting between the NDRC and Samsung was prompted by Chinese smartphone makers that were struggling under DRAM cost pressure.

56.     On December 26, 2017, Reuters reported that "China's economic regulator is paying close attention to a recent surge in the price of mobile phone storage chips and could look into possible price fixing by the firms that make them[.]" Xu Xinyu, an official with the NDRC Pricing Supervision Department, was quoted in the state-run China Daily newspaper as saying that, "We have noticed the price surge and will pay more attention to future problems that may be caused by 'price fixing' in the sector." According to the China Daily, "the official referred to possible coordinated action taken by a number of firms to gain maximum profits by pushing the price of the product as high as possible."

57.     According to CW7, the PRC's State Administration for Market Regulation ("SAMR") separately initiated an investigation of Micron's anticompetitive conduct at the beginning of 2018, seeking interviews with Micron personnel. After an initial round of interviews and discussions between Micron and SAMR, the Company agreed to reduce its prices as requested. Prices continued to increase, however. Micron's failure to deliver on its promise, combined with Micron's uncooperative and arrogant attitude, angered SAMR and led to its raid of the Company in May 2018.

58.     In June 2018, it was reported that China had launched a probe into Micron, Samsung, and SK Hynix, specifically investigating price-fixing allegations. On June 1, 2018, Micron issued a statement "confirm[ing] that China's State Administration for Market Regulation authorities visited Micron's China sales offices on May 31, 2018 seeking certain information." Samsung and SK Hynix also confirmed that the regulator had visited their offices.

59. As was reported at the end of the Class Period, there was massive evidence that Micron and its supposed competitors were engaging in anticompetitive conduct to artificially inflate DRAM prices.

60. Pursuant to Article 46 of the Anti-Monopoly Law of the People's Republic of China (effective August 1, 2008), the largest fine that Micron faces is 10% of its sales in China during the previous year.

### D.    Impact of China's Investigation

61. As soon as China began to inquire into anticompetitive conduct, DRAM prices abruptly stopped its steep ascent in early 2018.

62. CW2 stated that during a bull market—*i.e.*, a time of rising prices—customers would purchase more inventory then they need, and when they start to expect prices to go down, they will cut back on the purchases to bleed off the excess inventory.

63. CW4 similarly stated that when prices start to increase, end markets start to accumulate inventory to mitigate against paying higher prices later.

64. According to DRAMeXchange, server manufacturers had been aggressively stocking up on memory products since the third quarter of 2017. The server DRAM market had been experiencing rising prices as supply had been unable keep up with growing demand from the construction of data centers.

65. Also according to DRAMeXchange, Chinese PC and server manufacturers responded to tight supply and rising prices by implementing cost control measures, which included aggressively stocking up on memory products since the third quarter of 2017.

66. In May 2018, the same month that SAMR regulators raided Micron, it was reported that Samsung and HK Hynix were investing more than $35 billion to increase their memory

manufacturing capacities. Industry analysts stated that the supply shortage could see improvement sometime in the second half of 2018.

67.     Throughout 2017, there were consistent reports of a worldwide memory shortage and speculation as to whether Micron, Samsung, and SK Hynix were unable to unwilling to keep up with demand. This news affirmed that they were unwilling—that is, until China began to investigate anticompetitive conduct.

68.     In the first half of 2018, while DRAM contract prices continued to rise, spot prices began to fall. by June 2018, spot prices fell below contract prices, which is an early indicator of a possible overall DRAM price decline.

69.     By the end of August 2018, the added supply capacity expected in late 2018, combined with slowing demand, was expected to result in DRAM transitioning very quickly from shortage to oversupply.

70.     After price growth for nine consecutive quarters, DRAM prices began to weaken in the third quarter of 2018.

71.     As DRAMeXchange stated in September 2018, "[a]lthough end-product manufacturers as a whole are seeing a gradual drop in their DRAM inventories after posting shipment growths in this year's first half, they are also noticing that the supply situation in the DRAM market is shifting from tight to loose." Consequently, equipment manufacturers did not see any urgency to replenish their DRAM inventory as supply expanded.

72.     The industry suddenly had a global glut of DRAM products.

**E.     Weakening Demand in 2018**

73.     Internally, based on information obtained from its customers, Micron saw that the market demand for its DRAM products was weakening in 2018. In particular, thanks to China's regulatory actions, the collusive behavior of Micron, Samsung, and SK Hynix had been broken,

leading to expanding capacity and moderating prices. Therefore, given the outlook of moderating or even declining prices, Micron's customers no longer saw the need to accumulate DRAM inventory. What was a supply shortage very quickly became an inventory glut.

74.     CW1 stated that Micron gauged customer demand by examining many different signals from customers, analysts, and Micron's own inventory. Among other things, Micron analyzed customer data triangulated with industry data. Micron also assessed demand through customer meetings, during which a customer would indicate how much inventory it currently had and whether it intended to pull back or buy more product. Certain customers anecdotally provided information regarding their inventories and projected inventories.

75.     Similarly, CW2 stated that because Micron generally had tight relations with the procurement personnel of large customers, customers would anecdotally inform Micron's account executives when they had accumulated excess inventory and intended to cut back on purchases.

76.     CW3 stated that Micron had a group within the sales department that sought to track customers' inventory to the extent possible.

77.     CW4 also stated that Micron had a team dedicated to obtaining inventory data from customers.

78.     CW6 stated that Micron's many of customers submitted forecasts on a monthly basis. If Micron was not receiving strong forecasts from customers, that signaled demand was light or there is a build-up of inventory. According to CW6, during 2018, the information communicated across the board was that the market was softening.

79.     During the relevant time period, CW1 attended a weekly staff meeting led by Bhatia, the Executive Vice President of worldwide operations who reported directly to the CEO. These staff meetings involved Bhatia's direct reports, including the heads of global operations and global

quality. One purpose of the meeting was to assess the buying patterns and demand of Micron's customers. By the time CW1 left Micron in June 2018, the Company's management was aware of a weakening market and that demand was dropping off. Among other things, data showed a softening of the market during the second quarter of 2018.

80.     During the relevant time period, CW5 attended regular meetings to discuss marketing and prepare manufacturing plans. By the time CW5 left Micron in May 2018, CW5 participated in discussions among the Company's management that customer inventory was building and that they could see the market softening.

## VII.     MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.     2017 Fourth Quarter and Year-End

81.     On September 26, 2017, Micron issued a press release announcing its fourth quarter and full-year 2017 financial results (the "2017 4Q Release"). The Company reported quarterly revenues of $6.14 billion, 91% higher compared with the prior year quarter, and full-year revenues of $20.32 billion, 64% higher compared with the prior fiscal year. Defendant Mehrotra was quoted as saying, "Micron delivered exceptional fourth quarter and fiscal year results, reflecting solid execution and robust demand for our memory and storage solutions."

82.     The 2017 4Q Release also reported that DRAM sales volumes for the quarter were 5% higher and that DRAM average selling prices for the quarter increased 8%. Micron's overall consolidated gross margin of 50.7% for the quarter was reportedly higher compared to 46.9% in the previous quarter due to expansion of margins for DRAM products.

83.     On October 26, 2017, Micron filed its annual report on Form 10-K for the period ended August 31, 2017 (the "2017 10-K"). In addition to reporting the revenue figures stated above, the 2017 10-K disclosed that more than half of the Company's $20.32 billion of total revenues,

$10.39 billion, were generated in China, and that well more than half of its total revenues, $12.96

billion, were generated from DRAM sales.

84.    Addressing the operating results for the Company's DRAM segment, the 2017 10-K

stated:

> Strong conditions in 2017 for enterprise, client, mobile, graphics, and networking markets as well as key customer qualifications drove increases in sales volumes and prices as compared to 2016. The reductions in cost for 2017 and 2016 as compared to prior years were primarily due to improvements in product and process technology. For 2017 compared to 2016, lower depreciation due to the change made in the fourth quarter of 2016 in estimated useful lives for equipment at our DRAM wafer fabrication facilities contributed to cost reductions.

> Our gross margin percentage on sales of DRAM products for 2017 improved from 2016 primarily due to manufacturing cost reductions, increases in average selling prices, and shifts in product mix, while our gross margin percentage for 2016 declined as compared to 2015 as decreases in average selling prices outpaced manufacturing cost reductions.

85.    Under the section titled "Competition," the 2017 10-K stated:

> Our competitors generally seek to increase silicon capacity and bits per wafer, which may result in significant increases in worldwide supply and downward pressure on prices. Increases in worldwide supply of semiconductor memory and storage products also result from capacity expansions, either by way of new facilities, increased capacity utilization, or reallocation of other semiconductor production to semiconductor memory and storage production. Our competitors may increase capital expenditures or increase capacity at existing or new facilities, resulting in future increases in worldwide supply. Increases in worldwide supply of semiconductor memory and storage, if not accompanied by commensurate increases in demand, would lead to declines in average selling prices for our products and materially adversely affect our business, results of operations, or financial condition.

86.    Under the section titled "Risk Factors," the 2017 10-K stated:

> **The semiconductor memory and storage markets are highly competitive.**

> We face intense competition in the semiconductor memory and storage markets from a number of companies, including Intel; Samsung Electronics Co., Ltd.; SK Hynix Inc.; Toshiba Corporation; and Western Digital Corporation. Some of our competitors are large corporations or conglomerates that may have greater resources to invest in technology, capitalize on growth opportunities, and withstand downturns in the semiconductor markets in which we compete. Consolidation of industry competitors could put us at a competitive disadvantage. In addition, some

governments, such as China, have provided, and may continue to provide, significant financial assistance to some of our competitors or to new entrants. Our competitors generally seek to increase silicon capacity, improve yields, and reduce die size in their product designs which may result in significant increases in worldwide supply and downward pressure on prices. Increases in worldwide supply of semiconductor memory and storage also result from fabrication capacity expansions, either by way of new facilities, increased capacity utilization, or reallocation of other semiconductor production to semiconductor memory and storage production. Our competitors may increase capital expenditures resulting in future increases in worldwide supply. We and some of our competitors have plans to ramp, or are constructing or ramping, production at new fabrication facilities. Increases in worldwide supply of semiconductor memory and storage, if not accompanied by commensurate increases in demand, would lead to further declines in average selling prices for our products and would materially adversely affect our business, results of operations, or financial condition. If competitors are more successful at developing or implementing new product or process technology their products could have cost or performance advantages. The competitive nature of our industry could have a material adverse effect on our business, results of operations, or financial condition.

87.    Also under the section titled "Risk Factors," the 2017 10-K stated:

**We have experienced volatility in average selling prices for our semiconductor memory and storage products which may adversely affect our business.**

We have experienced significant volatility in our average selling prices, including dramatic declines, as noted in the table below and may continue to experience such volatility in the future. In some prior periods, average selling prices for our products have been below our manufacturing costs and we may experience such circumstances in the future. Decreases in average selling prices for our products that decline faster than our costs could have a material adverse effect on our business, results of operations, or financial condition.

88.    The above statements were materially false and/or misleading because they failed to disclose to investors that: (1) the Company engaged in anticompetitive behavior, including artificially restricting supply growth of DRAM; (2) these anticompetitive efforts were reasonably likely to lead to regulatory scrutiny; (3) the Company's anticompetitive efforts artificially boosted its operating metrics; (4) as a result, the Company's financial performance, including revenue, was overstated; and (5) ceasing collusive behavior would result in a moderating of prices, leading to customers to cut back on stockpiling and resulting in an inventory glut.

### B.    2018 First Quarter

89.    On December 19, 2017, Micron issued a press release announcing its first quarter 2018 financial results (the "2018 1Q Release"). The Company reported quarterly revenues of $6.80 billion, 71% higher compared with the prior year quarter. Defendant Mehrotra was quoted as saying, "Micron's strong results were driven by double-digit sequential revenue growth in mobile, server and SSD applications, with expanded gross margins and improved profitability."

90.    The 2018 1Q Release also reported that: "Revenues for the first quarter of 2018 were 11 percent higher compared to the fourth quarter of 2017, reflecting increased demand for our mobile, server, and SSD products. Our overall consolidated gross margin of 55.1 percent for the first quarter of 2018 was higher compared to 50.7 percent for the fourth quarter of 2017 and reflects margin expansion for both DRAM and Trade NAND products supported by ongoing strength in the pricing environment and a favorable product mix."

91.    On December 20, 2017, Micron filed its quarterly report on Form 10-Q for the period ended November 30, 2017 (the "2018 1Q 10-Q"). In addition to reporting the revenue figures stated above, well more than half of the Company's $6.80 billion of total revenues, $4.56 billion, were generated from DRAM sales.

92.    Addressing the operating results for the Company's DRAM segment, the 2018 1Q 10-Q stated:

> Increases in sales volumes and prices in the first quarter of 2018 as compared to the fourth and first quarters of 2017 resulted from strong conditions for mobile, enterprise, client, and graphics markets driven by seasonal demand for client PCs, solid acceptance of new flagship smartphones, and ongoing strength from servers, particularly in cloud and hyperscale data centers. Our gross margin percentage on sales of DRAM products for the first quarter of 2018 improved from the fourth and first quarters of 2017 primarily due to increases in average selling prices and manufacturing cost reductions.

93.    Under the section titled "Risk Factors," the 2018 1Q 10-Q stated:

**We have experienced volatility in average selling prices for our semiconductor memory and storage products which may adversely affect our business.**

We have experienced significant volatility in our average selling prices, including dramatic declines, as noted in the table below, and may continue to experience such volatility in the future. In some prior periods, average selling prices for our products have been below our manufacturing costs and we may experience such circumstances in the future. Decreases in average selling prices for our products that decline faster than our costs could have a material adverse effect on our business, results of operations, or financial condition.

94.    Under the section titled "Risk Factors," the 2018 1Q 10-Q stated:

**The semiconductor memory and storage markets are highly competitive.**

We face intense competition in the semiconductor memory and storage markets from a number of companies, including Intel; Samsung Electronics Co., Ltd.; SK Hynix Inc.; Toshiba Corporation; and Western Digital Corporation. Some of our competitors are large corporations or conglomerates that may have greater resources to invest in technology, capitalize on growth opportunities, and withstand downturns in the semiconductor markets in which we compete. Consolidation of industry competitors could put us at a competitive disadvantage. In addition, some governments, such as China, have provided, and may continue to provide, significant financial assistance to some of our competitors or to new entrants. Our competitors generally seek to increase silicon capacity, improve yields, and reduce die size in their product designs which may result in significant increases in worldwide supply and downward pressure on prices. Increases in worldwide supply of semiconductor memory and storage also result from fabrication capacity expansions, either by way of new facilities, increased capacity utilization, or reallocation of other semiconductor production to semiconductor memory and storage production. Our competitors may increase capital expenditures resulting in future increases in worldwide supply. We and some of our competitors have plans to ramp, or are constructing or ramping, production at new fabrication facilities. Increases in worldwide supply of semiconductor memory and storage, if not accompanied by commensurate increases in demand, would lead to further declines in average selling prices for our products and would materially adversely affect our business, results of operations, or financial condition. If competitors are more successful at developing or implementing new product or process technology, their products could have cost or performance advantages. The competitive nature of our industry could have a material adverse effect on our business, results of operations, or financial condition.

95.    The above statements were materially false and/or misleading because they failed to

disclose to investors that: (1) the Company engaged in anticompetitive behavior, including

artificially restricting supply growth of DRAM; (2) these anticompetitive efforts were reasonably

likely to lead to regulatory scrutiny; (3) the Company's anticompetitive efforts artificially boosted its operating metrics; (4) as a result, the Company's financial performance, including revenue, was overstated; and (5) ceasing collusive behavior would result in a moderating of prices, leading to customers to cut back on stockpiling and resulting in an inventory glut.

### C.   2018 Second Quarter

96.   On March 22, 2018, Micron issued a press release announcing its second quarter 2018 financial results (the "2018 2Q Release"). The Company reported quarterly revenues of $7.35 billion, 58% higher compared with the prior year quarter. Defendant Mehrotra was quoted as saying, "Micron executed exceptionally well in the second quarter, delivering record results and strong free cash flow driven by broad-based demand for our memory and storage solutions. Our performance was accentuated by an ongoing shift to high-value solutions as we grew sales to our cloud, mobile and automotive customers and set new records for SSDs and graphics memory."

97.   On March 23, 2018, Micron filed its quarterly report on Form 10-Q for the period ended March 1, 2018 (the "2018 2Q 10-Q"). In addition to reporting the revenue figures stated above, well more than half of the Company's $7.35 billion of total revenues, $5.21 billion, were generated from DRAM sales.

98.   Addressing the operating results for the Company's DRAM segment, the 2018 2Q 10-Q stated:

> Increases in sales volumes and prices for the second quarter of 2018 as compared to the first quarter of 2018 and second quarter of 2017 resulted from strong conditions for server, mobile, and client markets. Our gross margin percentage on sales of DRAM products for the second quarter of 2018 improved from the first quarter of 2018 and second quarter of 2017 primarily due to increases in average selling prices due to favorable market conditions and manufacturing cost reductions.

99.   Under the section titled "Risk Factors," the 2018 2Q 10-Q stated:

> **We have experienced volatility in average selling prices for our semiconductor memory and storage products which may adversely affect our business.**

We have experienced significant volatility in our average selling prices, including dramatic declines, as noted in the table below, and may continue to experience such volatility in the future. In some prior periods, average selling prices for our products have been below our manufacturing costs and we may experience such circumstances in the future. Decreases in average selling prices for our products that decline faster than our costs could have a material adverse effect on our business, results of operations, or financial condition.

100.    Under the section titled "Risk Factors," the 2018 2Q 10-Q stated:

**The semiconductor memory and storage markets are highly competitive.**

We face intense competition in the semiconductor memory and storage markets from a number of companies, including Intel; Samsung Electronics Co., Ltd.; SK Hynix Inc.; Toshiba Corporation; and Western Digital Corporation. Some of our competitors are large corporations or conglomerates that may have greater resources to invest in technology, capitalize on growth opportunities, and withstand downturns in the semiconductor markets in which we compete. Consolidation of industry competitors could put us at a competitive disadvantage. In addition, some governments, such as China, have provided, and may continue to provide, significant financial assistance to some of our competitors or to new entrants. Our competitors generally seek to increase silicon capacity, improve yields, and reduce die size in their product designs which may result in significant increases in worldwide supply and downward pressure on prices. Increases in worldwide supply of semiconductor memory and storage also result from fabrication capacity expansions, either by way of new facilities, increased capacity utilization, or reallocation of other semiconductor production to semiconductor memory and storage production. Our competitors may increase capital expenditures resulting in future increases in worldwide supply. We and some of our competitors have plans to ramp, or are constructing or ramping, production at new fabrication facilities. Increases in worldwide supply of semiconductor memory and storage, if not accompanied by commensurate increases in demand, would lead to further declines in average selling prices for our products and would materially adversely affect our business, results of operations, or financial condition. If competitors are more successful at developing or implementing new product or process technology, their products could have cost or performance advantages. The competitive nature of our industry could have a material adverse effect on our business, results of operations, or financial condition.

101.    The above statements were materially false and/or misleading because they failed to disclose to investors that: (1) the Company engaged in anticompetitive behavior, including artificially restricting supply growth of DRAM; (2) these anticompetitive efforts were reasonably likely to lead to regulatory scrutiny; (3) the Company's anticompetitive efforts artificially boosted its operating metrics; (4) as a result, the Company's financial performance, including revenue, was

overstated; and (5) ceasing collusive behavior would result in a moderating of prices, leading to customers to cut back on stockpiling and resulting in an inventory glut.

### D.    2018 Third Quarter

102.    On June 20, 2018, Micron issued a press release announcing its second quarter 2018 financial results (the "2018 3Q Release"). The Company reported quarterly revenues of $7.80 billion, 40% higher compared with the prior year quarter. Defendant Mehrotra was quoted as saying, "We strengthened our competitive position and grew our revenue across virtually all of our high-value product segments. We set new records for revenue in SSDs, Mobile Managed NAND and Automotive solutions along with Cloud/Enterprise and Graphics DRAM Memory. We see ongoing momentum and healthy industry fundamentals in the fourth quarter to close out an exceptionally strong fiscal 2018."

103.    On June 22, 2018, Micron filed its quarterly report on Form 10-Q for the period ended May 31, 2018 (the "2018 3Q 10-Q"). In addition to reporting the revenue figures stated above, well more than half of the Company's $7.80 billion of total revenues, $5.54 billion, were generated from DRAM sales.

104.    Addressing the operating results for the Company's DRAM segment, the 2018 2Q 10-Q stated:

> Increases in DRAM product revenue for the third quarter of 2018 as compared to the second quarter of 2018 resulted from strong market conditions, particularly for high-value cloud and enterprise server markets. Increases in DRAM product revenue for the third quarter and first nine months of 2018 as compared to the corresponding periods of 2017 resulted from strong conditions across key markets, particularly for cloud, enterprise, mobile, and graphics markets. Our gross margin percentage on sales of DRAM products for the third quarter and first nine months of 2018 improved from the second quarter of 2018 and corresponding periods of 2017 primarily due to strong demand as a result of favorable market conditions, shifts in mix to higher value markets, and manufacturing cost reductions resulting from strong execution on our implementation of new technology.

105.    Under the section titled "Risk Factors," the 2018 2Q 10-Q stated:

**We have experienced volatility in average selling prices for our semiconductor memory and storage products which may adversely affect our business.**

We have experienced significant volatility in our average selling prices, including dramatic declines, as noted in the table below, and may continue to experience such volatility in the future. In some prior periods, average selling prices for our products have been below our manufacturing costs and we may experience such circumstances in the future. Decreases in average selling prices for our products that decline faster than our costs could have a material adverse effect on our business, results of operations, or financial condition.

106.    Under the section titled "Risk Factors," the 2018 2Q 10-Q stated:

**The semiconductor memory and storage markets are highly competitive.**

We face intense competition in the semiconductor memory and storage markets from a number of companies, including Intel; Samsung Electronics Co., Ltd.; SK Hynix Inc.; Toshiba Corporation; and Western Digital Corporation. Some of our competitors are large corporations or conglomerates that may have greater resources to invest in technology, capitalize on growth opportunities, and withstand downturns in the semiconductor markets in which we compete. Consolidation of industry competitors could put us at a competitive disadvantage. In addition, some governments, such as China, have provided, and may continue to provide, significant financial assistance to some of our competitors or to new entrants. Our competitors generally seek to increase silicon capacity, improve yields, and reduce die size in their product designs which may result in significant increases in worldwide supply and downward pressure on prices. Increases in worldwide supply of semiconductor memory and storage also result from fabrication capacity expansions, either by way of new facilities, increased capacity utilization, or reallocation of other semiconductor production to semiconductor memory and storage production. Our competitors may increase capital expenditures resulting in future increases in worldwide supply. We and some of our competitors have plans to ramp, or are constructing or ramping, production at new fabrication facilities. Increases in worldwide supply of semiconductor memory and storage, if not accompanied by commensurate increases in demand, would lead to further declines in average selling prices for our products and would materially adversely affect our business, results of operations, or financial condition. If competitors are more successful at developing or implementing new product or process technology, their products could have cost or performance advantages. The competitive nature of our industry could have a material adverse effect on our business, results of operations, or financial condition.

107.    The above statements were materially false and/or misleading because they failed to disclose to investors that: (1) the Company engaged in anticompetitive behavior, including artificially restricting supply growth of DRAM; (2) these anticompetitive efforts were reasonably

25

likely to lead to regulatory scrutiny; (3) the Company's anticompetitive efforts artificially boosted its operating metrics; (4) as a result, the Company's financial performance, including revenue, was overstated; and (5) ceasing collusive behavior would result in a moderating of prices, leading to customers to cut back on stockpiling and resulting in an inventory glut.

### E.   2018 Fourth Quarter and Year-End

108.   On September 20, 2018, Micron issued a press release announcing its fourth quarter and full-year 2018 financial results (the "2018 4Q Release"). The Company reported quarterly revenues of $8.44 billion, 38% higher compared with the prior year quarter, and full-year revenues of $30.39 billion, 50% higher compared with the prior fiscal year. Defendant Mehrotra was quoted as saying, "In the fourth quarter, we set revenue records across all our major markets, from automotive and industrial to mobile and cloud datacenters. The secular and diversified growth drivers in our industry combined with accelerating pace of transformation of the new Micron form a tremendous catalyst for us to create enduring value for our customers and investors in 2019 and the years ahead."

109.   On October 15, 2018, Micron filed its annual report on Form 10-K for the period ended August 30, 2018 (the "2018 10-K"). In addition to reporting the revenue figures stated above, the 2018 10-K disclosed that more than half of the Company's $30.39 billion of total revenues, $17.36 billion, were generated in China, and that well more than half of its total revenues, $21.23 billion, were generated from DRAM sales.

110.   Addressing the operating results for the Company's DRAM segment, the 2017 10-K stated:

> Strong conditions in 2017 for enterprise, client, mobile, graphics, and networking markets as well as key customer qualifications drove increases in sales volumes and prices as compared to 2016. The reductions in cost for 2017 and 2016 as compared to prior years were primarily due to improvements in product and process technology. For 2017 compared to 2016, lower depreciation due to the change made in the fourth

quarter of 2016 in estimated useful lives for equipment at our DRAM wafer fabrication facilities contributed to cost reductions.

Our gross margin percentage on sales of DRAM products for 2017 improved from 2016 primarily due to manufacturing cost reductions, increases in average selling prices, and shifts in product mix, while our gross margin percentage for 2016 declined as compared to 2015 as decreases in average selling prices outpaced manufacturing cost reductions.

111.    Under the section titled "Competition," the 2017 10-K stated:

We face intense competition in the semiconductor memory and storage markets from a number of companies, including Intel; Samsung Electronics Co., Ltd.; SK Hynix Inc.; Toshiba Memory Corporation; and Western Digital Corporation. Some of our competitors are large corporations or conglomerates that may have greater resources to invest in technology, capitalize on growth opportunities, and withstand downturns in the semiconductor markets in which we compete. Consolidation of industry competitors could put us at a competitive disadvantage. In addition, some governments have provided and may continue to provide significant assistance, financial or otherwise, to some of our competitors or to new entrants and may intervene in support of national industries and/or competitors. In particular, we face the threat of increasing competition as a result of significant investment in the semiconductor industry by the Chinese government and various state-owned or affiliated entities that is intended to advance China's stated national policy objectives. In addition, the Chinese government may restrict us from participating in the China market or may prevent us from competing effectively with Chinese companies.

Our competitors generally seek to increase silicon capacity, improve yields, and reduce die size in their product designs which may result in significant increases in worldwide supply and downward pressure on prices. Increases in worldwide supply of semiconductor memory and storage also result from fabrication capacity expansions, either by way of new facilities, increased capacity utilization, or reallocation of other semiconductor production to semiconductor memory and storage production. Our competitors may increase capital expenditures resulting in future increases in worldwide supply. We and some of our competitors have plans to ramp, or are constructing or ramping, production at new fabrication facilities. Increases in worldwide supply of semiconductor memory and storage, if not accompanied by commensurate increases in demand, would lead to declines in average selling prices for our products and would adversely affect our business, results of operations, and financial condition. If competitors are more successful at developing or implementing new product or process technology, their products could have cost or performance advantages.

Certain of our memory and storage products are manufactured to industry standard specifications and, as such, have similar performance characteristics to those of our competitors. For these products, the principal competitive factors are generally price

and performance characteristics including: operating speed, power consumption, reliability, compatibility, size, and form factors.

112.    Under the section titled "Risk Factors," the 2017 10-K stated:

**The semiconductor memory and storage markets are highly competitive.**

We face intense competition in the semiconductor memory and storage markets from a number of companies, including Intel; Samsung Electronics Co., Ltd.; SK Hynix Inc.; Toshiba Memory Corporation; and Western Digital Corporation. Some of our competitors are large corporations or conglomerates that may have greater resources to invest in technology, capitalize on growth opportunities, and withstand downturns in the semiconductor markets in which we compete. Consolidation of industry competitors could put us at a competitive disadvantage. In addition, some governments have provided, and may continue to provide, significant assistance, financial or otherwise, to some of our competitors or to new entrants and may intervene in support of national industries and/or competitors. In particular, we face the threat of increasing competition as a result of significant investment in the semiconductor industry by the Chinese government and various state-owned or affiliated entities that is intended to advance China's stated national policy objectives. In addition, the Chinese government may restrict us from participating in the China market or may prevent us from competing effectively with Chinese companies.

Our competitors generally seek to increase silicon capacity, improve yields, and reduce die size in their product designs which may result in significant increases in worldwide supply and downward pressure on prices. Increases in worldwide supply of semiconductor memory and storage also result from fabrication capacity expansions, either by way of new facilities, increased capacity utilization, or reallocation of other semiconductor production to semiconductor memory and storage production. Our competitors may increase capital expenditures resulting in future increases in worldwide supply. We and some of our competitors have plans to ramp, or are constructing or ramping, production at new fabrication facilities. Increases in worldwide supply of semiconductor memory and storage, if not accompanied by commensurate increases in demand, would lead to further declines in average selling prices for our products and would materially adversely affect our business, results of operations, or financial condition. If competitors are more successful at developing or implementing new product or process technology, their products could have cost or performance advantages.

The competitive nature of our industry could have a material adverse effect on our business, results of operations, or financial condition.

113.    Also under the section titled "Risk Factors," the 2017 10-K stated:

**We have experienced volatility in average selling prices for our semiconductor memory and storage products which may adversely affect our business.**

We have experienced significant volatility in our average selling prices, including dramatic declines, as noted in the table below, and may continue to experience such volatility in the future. In some prior periods, average selling prices for our products have been below our manufacturing costs and we may experience such circumstances in the future. Decreases in average selling prices for our products that decline faster than our costs could have a material adverse effect on our business, results of operations, or financial condition.

114.    The above statements were materially false and/or misleading because they failed to disclose to investors that: (1) the Company engaged in anticompetitive behavior, including artificially restricting supply growth of DRAM; (2) these anticompetitive efforts were reasonably likely to lead to regulatory scrutiny; (3) the Company's anticompetitive efforts artificially boosted its operating metrics; (4) as a result, the Company's financial performance, including revenue, was overstated; and (5) ceasing collusive behavior would result in a moderating of prices, leading to customers to cut back on stockpiling and resulting in an inventory glut.

## VIII.   VIOLATIONS OF ITEM 303 OF SEC REGULATION S-K

115.    Under Item 303 of SEC Regulation S-K, Micron's reports on Form 10-K and 10-Q were required to disclose known trends, events, or uncertainties that were having or were reasonably likely to have an unfavorable impact on the Company's net sales, revenue, or income from continuing operations. Item 303 imposes an affirmative duty on issuers to disclose "known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in a material way." S.E.C. Release No. 6835, 1989 WL 1092885, at *4; *see also* 17 C.F.R. § 229.303(a)(3). "Disclosure of known trends or uncertainties that the registrant reasonably expects will have a material impact on net sales, revenues, or income from continuing operations is also required. *Id.*

116.    Pursuant to Item 303(a), a registrant thus has the following affirmative duties:

a.      Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which the income was so affected.

b.      Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

17 C.F.R. § 229.303(a)(3)(i)-(ii); *see also* S.E.C. Release No. 6835, 1989 WL 1092885, at *8 (May 18, 1989) ("Other non-recurring items should be discussed as unusual or infrequent events or transactions that materially affected the amount of reported income from continuing operations.") (citation and quotation omitted).

117.    Thus, even a one-time event, if "reasonably expect[ed]" to have a material impact of results, must be disclosed. Examples of such required disclosures include: "[a] reduction in the registrant's product prices; erosion in the r[e]gistrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract." S.E.C. Release No. 6835, 1989 WL 1092885, at *4 (May 18, 1989).

118.    Accordingly, as the SEC has repeatedly emphasized, the "specific provisions in Item 303 [as set forth above] require disclosure of forward-looking information." *See Mgmt's Discussion and Analysis of Fin. Condition and Results of Operation*, S.E.C. Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989). Indeed, the SEC has stated that disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the company through the eyes of

management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition . . . with particular emphasis on the registrant's prospects for the future." *Id.* at *3, *17. Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects." *See Comm'n Guidance Regarding Mgmt's Discussion and Analysis of Fin. Condition and Results of Operations*, S.E.C. Release No. 8350, 2003 WL 22996757, at *11 (December 19, 2003).

119.    Micron's Form 10-K and Form 10-Q filings with the SEC during the Class Period violated Item 303 because they failed to disclose the known trend of rising prices caused by anticompetitive conduct, which had a material impact on the Company's financial results, and , once investigated by regulatory authorities, would cause the past financial results not to be representative of the Company's actual financial outlook.

## IX.    REVELATION OF THE TRUTH

120.    On September 6, 2018, securities analysts at Robert W. Baird & Co. ("Baird") significantly lowered its price target for Micron by 25%, stating that the Company was no longer a "top idea." Among other things, Baird warned that the market cycle for both DRAM and NAND were peaking. Also on September 6, 2018, a securities analyst at Morgan Stanley stated, "We recently met buyers and sellers of memory and believe that the 4Q outlook for server DRAM is worse than we previously expected along with the prospects for the rest of memory in 3Q."

121.    On November 19, 2018, the *Financial Times* reported that Wu Zhenguo, head of SAMR's anti-monopoly bureau, stated that investigators had "found 'massive evidence' of anti-competitive behaviour by the world's top three makers of computer memory chips" and their price-fixing investigation "had made important progress.'" The *Financial Times* also reported that, according to a securities analyst, China could impose fines of more than $2.5 billion on each of

Micron, Samsung, and SK Hynix if they are found to have fixed prices. Thus, allegations and suspicions of anticompetitive conduct were substantiated by this disclosure from China's regulatory authorities.

122.    On December 20, 2018, Micron made its disclosures for the second quarter of 2019. The Company issued financial guidance that was well-below consensus expectations by securities analysts, due to weakening demand for both DRAM and NAND products by several end-markets, including gaming, smartphone, and cloud service providers. Micron also disclosed that there was excess inventory in these channels and it would likely take three quarters for the inventory glut to subside.

## X.    ADDITIONAL ALLEGATIONS OF SCIENTER

123.    As alleged herein, Defendants knew, or recklessly disregarded, that the public statements they issued and disseminated throughout the Class Period were materially false and misleading and they knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements. Indeed, Defendants, by virtue of their receipt and knowledge of information reflecting the true facts regarding Micron's reliance on anticompetitive conduct, their control over, and/or receipt and/or modification of Micron's materially incomplete, false and misleading misstatements and/or their access to inside information concerning Micron and its reliance on anticompetitive conduct to DRAM generate revenue, knowingly or recklessly participated in the fraudulent course of conduct alleged herein. Indeed, the fraudulent scheme described in this Complaint could not have been perpetuated over such a substantial period of time without the knowledge and complicity, or at a minimum reckless disregard, of the personnel at the highest level of the Company, including the Individual Defendants.

A.     **Micron's DRAM Segment, Especially in China, Was Extremely Important to the Company's Success**

124.    Up to two-thirds of Micron's revenues have come from DRAM, the biggest driver of its business. During its fiscal year 2018, Micron reported that sales of its DRAM products rose 64%, with average selling prices rising by 35% and volumes growing 20%.

125.    Further, the Company's revenue from Chinese customers accounted for 57% of its total sales in 2018 and 51% in 2017.

B.     **Micron's Notification of China's Investigation**

126.    Although, as Micron has acknowledged, SAMR entered Micron's China sales offices on May 31, 2018 to obtain information, the Company knew of China's antitrust probe well before then.

127.    On December 22, 2017, the NDRC met with Samsung representatives to express concerns about Samsung's role in the continuing price increases for memory products. It is highly likely that Micron learned of this meeting contemporaneously.

128.    On December 26, 2017, an official with the NDRC Pricing Supervision Department was quoted in the press as saying that, "We have noticed the price surge and will pay more attention to future problems that may be caused by 'price fixing' in the sector." The official also "referred to possible coordinated action taken by a number of firms to gain maximum profits by pushing the price of the product as high as possible."

129.    Moreover, according to CW7, SAMR initiated an investigation of Micron's anticompetitive conduct at the beginning of 2018, seeking interviews with Micron personnel. It is implausible that the Company's senior was unaware of this development.

### C.     Micron's Notification of U.S. Civil Lawsuit

130.    On April 27, 2018, plaintiffs filed a class action lawsuit against Micron, Samsung, and SK Hynix on behalf of U.S. consumers of smartphones and personal computing products during the period June 1, 2016 through February 1, 2018. Filed in the U.S. District Court for the Northern District of California, the action titled *Jones v. Micron Technology, Inc., et al.*, alleges a conspiracy to artificially inflate DRAM prices by limiting the supply capacity, in violation of Section One of the Sherman Antitrust Act of 1890 and various antitrust, consumer protection, and unfair competition laws of various states.

### D.     Micron's Past Illegal, Anticompetitive Conduct

131.    In 2005, the U.S. Department of Justice ("DOJ") brought a criminal case against Micron, Samsung, SK Hynix, and other DRAM manufacturers, for fixing prices of DRAM between April 1999 and June 2002. The various criminal defendants and their coconspirators collectively paid $731 million in criminal fines and served 3,185 days of jail time.

132.    Although Micron faced criminal prosecution by the DOJ as well, it was given immunity from prosecution because it agreed to cooperate with prosecutors. As part of its cooperation agreement, Micron admitted its participation in the DRAM price-fixing conspiracy. In a sworn statement, Micron acknowledged that at least 31 of its executives and other employees had conspiratorial contacts with other DRAM manufacturers, including Hynix and Samsung, as well as other manufacturers.

133.    Micron's Senior Vice President for Marketing, Michael Sadler ("Sadler"), testified about the DRAM price-fixing conspiracy at the trial of an SK Hynix executive. Sadler testified that he participated in a "worldwide tour" to seek the cooperation of other manufacturers to restrict production, admitting that he was an "originator" of the idea. During all relevant times, Sadler was Micron's Chief Strategy Officer.

134.    The European Commission ("EC") also prosecuted DRAM manufacturers. Although the EC fined Micron for its role in the same price-fixing conspiracy, the Company avoided payment by being the first company to reveal the cartel to investigators and for its cooperation with the EC.

## XI.    CLASS ACTION ALLEGATIONS

135.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that purchased or otherwise acquired Micron securities during the Class Period and that were damaged thereby (the "Class"). Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Micron during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Micron's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

136.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Throughout the Class Period, Micron stock actively traded on the NASDAQ under the ticker symbol "MU." According to the Company's Report on Form 10-Q for the quarter ended November 30, 2017, as of December 20, 2017, Micron had 1,156,314,972 shares outstanding.

137.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

        a.      whether the Exchange Act was violated by Defendants;

        b.      whether Defendants misrepresented material facts;

       c.      whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

       d.      whether Defendants knew or recklessly disregarded that their statements were false and misleading, and/or omitted material facts;

       e.      whether the price of Micron securities was artificially inflated; and

       f.      the extent of damage sustained by Class members and the appropriate measure of damages.

138.    Plaintiff's claims are typical of the claims of members of the Class because both Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

139.    Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

140.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII.    LOSS CAUSATION AND ECONOMIC LOSS

141.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiff's and class members' economic loss. Plaintiff's claims for securities fraud are asserted under the fraud on the market theory of reliance. The market price of Micron securities, actively traded on the NASDAQ, were artificially inflated by the false and misleading statements and

material omissions complained of herein, including misleading statements and omissions concerning the substantial evidence in support of anticompetitive conduct by Micron.

142.     These false and misleading statements had the intended effect and caused Micron securities to trade at artificially inflated levels throughout the Class Period.

143.     The Class Period inflation in Micon securities was removed when the Company's anticompetitive conduct concealed by Defendants' false and misleading statements and omissions, or the financial, regulatory, and operational impacts thereof, were revealed to the market. The information was disseminated through several partial disclosures that slowly revealed the nature and extent of Micron's deliberate disregard for antitrust law. These disclosures, more particularly described below, removed artificial inflation from Micron securities and caused economic injury to Plaintiff and other members of the Class.

144.     The disclosures that corrected the market price to eliminate the inflation maintained by Defendants' fraud are detailed below.

a.       On September 6, 2018, Baird significantly lowered its price target for Micron by 25%, stating that the Company was no longer a "top idea." Baird warned that the market cycle for both DRAM and NAND were peaking. In addition, Morgan Stanley stated, "We recently met buyers and sellers of memory and believe that the 4Q outlook for server DRAM is worse than we previously expected along with the prospects for the rest of memory in 3Q." Following this disclosure, the price of Micron's shares declined $4.89, or 9.87%, from a closing price of $49.54 on September 5, 2018, to a closing price of $44.65 on September 6, 2018.

145.     On November 19, 2018, the *Financial Times* reported that SAMR's anti-monopoly bureau had "found 'massive evidence' of anti-competitive behaviour by the world's top three makers of computer memory chips" and their price-fixing investigation "had made important progress,'"

thereby substantiating allegations and suspicions of anticompetitive conduct by Micron and its supposed competitors. Following this disclosure, over the course of two trading days, November 19-20, 2018, the price of Micron's shares declined $3.32, or 8.42%, from a closing price of $39.44 on September 16, 2018 to a closing price of $36.12 on September 20, 2018.

## XIII.   PRESUMPTION OF RELIANCE

146.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

      a.      Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

      b.      the omissions and misrepresentations were material;

      c.      the Company's common stock traded in an efficient market;

      d.      the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

      e.      Plaintiff and other members of the Class purchased or acquired Micron securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

147.    At all relevant times, the market for Micron securities was efficient for the following reasons, among others:

      a.      as a regulated issuer, Micron filed periodic public reports with the SEC;

      b.      Micron regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

c.       Micron was followed by numerous securities analysts employed by major brokerage firms including, but not limited to, Robert W. Baird, Deutsche Bank, Keybanc, Morgan Stanley, Piper Jaffray, Raymond James, Stifel Nicolaus, and Wells Fargo, which wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms and that were publicly available and entered the public marketplace.

d.       Micron securities were actively traded on an efficient market, the NASDAQ, where the Company's common stock trades under the ticker symbol "MU."

148.    As a result of the foregoing, the market for Micron securities promptly digested current information regarding Micron from all publicly available sources and reflected such information in Micron securities. Under these circumstances, all purchasers and acquirers of Micron securities during the Class Period suffered similar injury through their purchases or acquisitions of Micron securities at artificially inflated prices, and the presumption of reliance applies.

149.    Further, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its operations, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

## XIV.   INAPPLICABILITY OF STATUTORY SAFE HARBOR

150.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the allegedly false statements and omissions pled in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and circumstances. To the extent certain of the statements alleged to be false and misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor is intended to

apply to any forward-looking statements pled herein, Micron and the Individual Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Micron who knew that those statements were false and misleading when made.

## XV.    CLAIMS FOR RELIEF

### COUNT I
### For Violations of Section 10(b) of the Exchange Act, and
### Rule 10b-5 Promulgated Thereunder, Against All Defendants

151.    Plaintiff repeats, incorporates, and realleges each allegation above as if fully set forth herein.

152.    This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC.

153.    During the Class Period, Defendants disseminated or approved the false statements specified herein, among others, which they knew, or recklessly disregarded, were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

154.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) in that they made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, which: (i) deceived the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflated and maintained the market price of Micron securities; and (iii) caused Plaintiff and other members of the Class to purchase or otherwise acquire Micron securities at

artificially inflated prices. In furtherance of this unlawful course of conduct, Defendants, each one of them, took the actions set forth herein.

155.    Pursuant to the above course of conduct, and by the use of means or instrumentalities of interstate commerce and/or of the mails, Defendants made statements in SEC filings and other public statements described above that were designed to influence the market for Micron securities. Such statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Micron's business prospects. Specifically, Defendants misleadingly failed to inform investors throughout the Class Period that there was substantial evidence in support of anticompetitive conduct by Micron.

156.    As described above, Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.

157.    Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Micron. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Micron's businesses, operations, future financial condition, and future prospects.

158.    As a result of the dissemination of the aforementioned false and misleading public statements, the market price of Micron's securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Micron's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased

Micron securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by Defendants, and were damaged thereby.

159. During the Class Period, Micron securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Micron securities at prices artificially inflated by Defendants' wrongful conduct.

160. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Micron securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Micron securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

161. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

162. As a direct and proximate result of the wrongful conduct of Defendants, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II
### For Violations of Section 20(a) of the Exchange Act
### Against Defendants Mehrotra, Maddock, and Zinsner

163.     Plaintiff repeats, incorporates, and realleges each allegation above as if fully set forth herein.

164.     During the Class Period, the Individual Defendants participated in the operation and management of Micron, and conducted and participated, directly and indirectly, in the conduct of Micron's business affairs. Because of their senior positions, they knew the adverse non-public information about Micron's business prospects, including that there was substantial evidence in support of anticompetitive conduct by Micron.

165.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Micron's financial condition and business prospects, and to correct promptly any public statements issued by Micron which had become materially false or misleading.

166.     Because of their positions of control and authority as senior officers of Micron, the Individual Defendants were able to, and did, control the contents of the various public statements that Micron made and disseminated in the marketplace during the Class Period concerning Micron's results of operations and business prospects. In their capacities as senior officers of Micron, the Individual Defendants had direct involvement in the day-to-day operations of the Company and reviewing and approving the Company's public statements. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Micron to engage in the wrongful acts complained of herein.

167.     The Individual Defendants, therefore, were "controlling persons" of Micron within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Micron's securities.

168.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Micron.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMAND**

Plaintiff hereby demands a trial by jury.

DATED:   June 14, 2019
           New York, New York

**GLANCY PRONGAY & MURRAY LLP**

By: */s/ Joshua L. Crowell*
Joshua L. Crowell
  *jcrowell@glancylaw.com*

Lionel Z. Glancy
Robert V. Prongay
Joshua L. Crowell
1925 Century Park East, Suite 2100
Los Angeles, California 90067
(310) 201-9150

*Lead Counsel for Lead Plaintiff Thomas Fish
and the Class*

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen
Jing Chen
275 Madison Avenue, 34th Floor
New York, New York 10016
(212) 686-1060

*Additional Counsel for Lead Plaintiff
and the Class*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On June 14, 2019, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 14, 2019, at Los Angeles, California.


*s/ Joshua L. Crowell*
Joshua L. Crowell