j7V9MICC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

IN RE MICRON TECHNOLOGY,

                              19 CV 678 (WHP)
                              19 CV 990 (WHP)
                              19 CV 2136 (WHP)

------------------------------x
                                        New York, N.Y.
                                        July 31, 2019
                                        11:33 a.m.

Before:

              HON. WILLIAM H. PAULEY III

                                        District Judge

                      APPEARANCES

GLANCY PRONGAY & MURRAY LLP
      Attorney for Plaintiff
BY:  JOSHUA L. CROWELL

SIMPSON THACHER & BARTLETT LLP
      Attorneys for Defendant
BY:  JONATHAN K. YOUNGWOOD
      JANET ANNE GOCHMAN
      DEAN MCGEE

j7V9MICC

(Case called)

MR. CROWELL:  Good morning, your Honor.  I'm Joshua Crowell of Glancy Prongay & Murray representing the plaintiff Fish.

THE COURT:  Good morning.

MR. YOUNGWOOD:  Good morning, your Honor.  Jonathan Youngwood, Simpson Thacher & Bartlett for the defendants.

MS. GOCHMAN:  Good morning, your Honor.  Janet Gochman also from Simpson Thacher & Bartlett for the defendants.

MR. MCGEE:  Dean McGee also from Simpson Thacher & Bartlett for the defendants.

THE COURT:  Good morning to all of you.

I should note at the outset for Mr. Crowell's benefit that Dean McGee who is on the team representing the defendant clerked for me some years back.  I have great respect for his abilities but I can assure you that it won't in any way affect my judgment independently evaluating the merits of this case.

MR. CROWELL:  I'm sure that is the case, your Honor.

THE COURT:  All right.  So, we have an amended pleading and we have, not surprisingly, a request from the defendant to file a motion to dismiss.

I guess my very first inquiry out of the box, Mr. Crowell, is looking at the arguments that the defendant wishes to make on its motion, have you given any consideration to whether you want to further amend your complaint before the

j7V9MICC

motion is teed up.

MR. CROWELL:  Yes, your Honor.  We have given that some serious consideration and we have decided to stand on our current operative complaint.

THE COURT:  We're going to explore some of these issues for a few minutes in this conference but, obviously, the purpose behind a premotion conference is to avoid multiple motions and I want the plaintiff to understand that at the end of the day if I grant a motion to dismiss a particular claim in this case that it will -- if the arguments have already been raised in advance, I'm unlikely to and, quite frankly, will not grant leave to replead that claim.

MR. CROWELL:  Understood, your Honor.

THE COURT:  I think, briefly, I'd like to get some overview from you about the allegations here, Mr. Crowell.

MR. CROWELL:  Yes, your Honor.

What distinguishes this case from other securities cases premised on anti competitive conduct is this, the statements, actions, and impact of Chinese antitrust regulators.  So near the start of the class period in December of 2017 Chinese regulators made it clear that they suspected collusive conduct and that they were going to do something about it.  And the first half of 2018 the supply discipline among the three competitors suddenly dissipated and prices started to stabilize and then fall.  And then at the end of the

j7V9MICC

class period China's chief antitrust regulator stood up and made a public statement saying that investigators had collected massive evidence of anti competitive behavior.  And so that is all on top of the so-called plus factors indicating a collusive agreement which is that supply constraint was a departure from past industry practice.  It led to a change from years of price declines to price -- sustained price increases and supracompetitive profit margins.

THE COURT:  One of the things -- if I could interrupt for a second.

MR. CROWELL:  Yes, your Honor.

THE COURT:  -- that I'm having difficulty getting my hands around is if prices were increasing for DRAM through 2017 why would that cause the end-users of those products to purchase more of them?

MR. CROWELL:  Well if you have sustained -- if you have increasing prices and you know it's pretty -- it's sustained and will continue into the future, you will buy more product than you otherwise would earlier, so you start to stockpile.  That is a normal mitigation strategy.  But then once you see prices start to stabilize and then fall, you don't need to stockpile anymore and then you have -- you end up having an inventory of more than you need and so postclass period Micron announced that they had essentially inventory overhang in its channels and that would take two to three or

j7V9MICC

more quarters to subside.

THE COURT:  It's sort of a variation of channel stuffing, isn't it?

MR. CROWELL:  No, your Honor.  Because it really is rooted in misrepresentations, omissions regarding collusive conduct.  But the excess inventory in the channel is really just the effect of that.  And it's not -- we're not alleging that -- because channel stuffing really is an allegation that the sales were improper, there was no economic real substance to them.  We're not alleging that.  So it's quite different from a channel stuffing case.

THE COURT:  Aren't many of the allegations in the complaint textbook parallel behavior?

MR. CROWELL:  No, your Honor, because there are the plus factors.  You have the preliminary conclusions of China's regulators, and the Chinese market is the largest importer of DRAM, and manufacturers in China were the most impacted by the price increases.  So they really had a -- China had a big stake in thoroughly investigating this and they have said that there is massive evidence in support of collusion.

Also, as I said, you have all these plus factors.  For instance, the supply discipline isn't explained by normal economic factors like raw material shortages.  It was in the competitor's economic self-interest to take advantage of the excess demand and to take market share; yet, none of them did

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

j7V9MICC

that.  And it only ended in response to regulatory action.  So all of these seem to raise this case above just your standard parallel conduct assertion.

THE COURT:  The first corrective disclosure that's alleged in the complaint, the one involving outside analysts talking about DRAM -- the DRAM industry is changing.  How is that a corrective disclosure?

MR. CROWELL:  Well, as explained in the letter, this is really a materialization of the concealed risk.  And that risk was fully disclosed after the class period where Micron announced the inventory overhang.  But really that this revelation by analysts that the DRAM market had peaked and that the outlook for DRAM was worse than previously expected, that was a materialization of that risk that was later fully revealed and, again, that overhang was a side effect of the collusive conduct.

THE COURT:  But what does that say, though, about collusive behavior?

MR. CROWELL:  I'm not sure what you mean.

THE COURT:  How is a price fixing conspiracy over a decade prior to the class period relevant?

MR. CROWELL:  That goes to the scienter issue, the fact that you had past admitted collusive conduct.  So they knew that there was this -- this market had a high susceptibility to collusion, especially in recent years because

j7V9MICC

the number of competitors had dwindled even more.  A senior executive who is directly implicated in that was still a senior executive at the company.  And when, given that history, once China's regulators had started to make noise about investigation and to take action, that really gave rise, a strong duty to inquire and disclose any anti competitive conduct.  And, again, that occurred toward the beginning of the class period so they certainly -- that investigation certainly gave defendants clear notice for several months to disclose their anti competitive conduct.

THE COURT:  What is your point with respect to Micron tracking customer demand?  How is that really relevant?  Don't most corporations try to track customer demand so they can respond to it?

MR. CROWELL:  I didn't get into it in the letter because of space constraints but it really is just an added aspect to scienter inference, which is that the company saw that at the time that supply constraint -- supply discipline was subsiding, the market demand was also starting to slow and, therefore, they knew or should have known that this inventory overhang was coming and was going to come much more strongly than any investor or analyst could have expected.

THE COURT:  Thank you.

Let me hear from the defendant.  Mr. Youngwood.

MR. YOUNGWOOD:  Thank you, your Honor.  I'll be brief

j7V9MICC

but happy to answer questions.  I think our main points are in the letter albeit in abbreviated format.

If there is no properly pled antitrust conspiracy, there is no securities case here.  I think we're all in agreement on that.

Although not mentioned in the letters, there is some openness as to what the proper standard for analyzing the antitrust conspiracy would be whether it's rule --

THE COURT:  I'm curious about that myself.  How is the antitrust pleading standard relevant here?

MR. YOUNGWOOD:  Your Honor, I will say that not mentioned in either side's letter -- just, again, I think for space -- there is some case law in this district on that, I think most recently, or at least recently, there is a case, Gam v. Anderson Farms, Judge Berman's decision, where he does apply the PSLRA in 9(b).  There are other authority within the district where the issue isn't reached because the Court decides the same result would apply regardless of the standard.

I will say here that I think regardless of the standard we would prevail but I think the appropriate standard here must be the PSLRA and 9(b).  It's a securities fraud case. It can't just hang on Rule 8.  So I do think should we go forward with the briefing that will probably be one of the things the sides put forth to you, although I think the conclusion must be PSLRA and 9(b) but I can't point you to a

Second Circuit decision that so says.

In terms of the substance of the allegation, I think your Honor's questions go to a lot of what we would argue and discuss. Under Second Circuit law in general, for antitrust -- and, again, not in the context of a pure securities case, but there's going to be some overlay, at least as to what's important. And then I think you apply the higher standard of 9(b) and PSLRA. You either have to have direct evidence or you've got to have parallel conduct in the plus factors. They have neither.

In terms of direct evidence, I don't think there's any suggestion that they have direct evidence. There is no conversation reported; there is no texts; there is no e-mails; nobody observing meetings where things were discussed. So I don't think we're anywhere in the direct evidence.

Even under the parallel behavior, I don't think they even pled the beginning of that. I mean this with all respect. The complaint is a model of conclusionary statements. It pleads that there was parallel behavior without telling us what that behavior was other than just some general agreement to limit supply and increase prices. But none of the: When were the prices increased, how was the supply limited.

If you go to the cases, including the cases they cite in their letter, pure antitrust cases, not securities cases, you see significantly greater detail on proving and pleading

the conscious parallelism.

And then even if they did do that to a standard under 9(b) PSLRA that gets you there, they don't have the plus factors. I think the one plus factor they want to point to is the existence of the government investigation. But that's not a plus factor. That's just an allegation out there that they in no way are able to elaborate on other than to say it was reported that a government of another country has made statements about this industry in general that in some way related with their claims. If you continue to go through the pleadings and compare it to the case law, most of it in the antitrust context -- so, again, without the heightened pleading standard -- you're again missing all of the typical plus factors. There are no meetings -- again, if there was direct evidence, we would know what happened at the meeting. But there was no even pleading of meetings. There is no pleading of frequent communication. There is no pleading that occurs in some of the cases of employees moving from one company to the other and somehow that being a partial mechanism of the conspiracy.

THE COURT: What's the rational business motive for one of these three suppliers of DRAM not jumping in when prices were escalating and demand was high? Wouldn't that be an ideal opportunity for any one of the three companies to have increased their production?

MR. YOUNGWOOD:  It might be, your Honor, but I think that makes an assumption about the ability to just turn a switch and increase production, which isn't pled.  It makes an assumption about ability to do something like that quickly.  It makes an assumption that you might not have other legitimate needs for your capital at the time which isn't pled.

I suppose it's all possible but we have no pleadings other than a sentence or two to just say, frankly, no more than your Honor just said about what happened.  It's simply not pled, not to a Rule 8 standard and certainly not to a 10b-5 securities PSLRA standard.

The one specificity we have, your Honor, are citations I think to three public statements of my client about supply and what they were doing, you know, excerpts from calls or other statements, and then a statement that the other companies make similar statements.  But we're not told what those statements are, when they took place, what the substance was, what the context, frankly, and from my clients' statements much less these unnamed statements of the other companies.  That's the -- I point that out because it's the most specific the entire complaint gets about any of this.  And that itself is almost a nothing.  It's alleged statements by one of the three alleged coconspirators and nothing about the others other than they said the same thing.

THE COURT:  What about the plaintiffs' argument or

theory in their pleading that once the existence of an investigation was disclosed in late 2017 that the individual defendants had a duty to investigate whether collusion was ongoing?

MR. YOUNGWOOD:  I think that would go to the scienter, your Honor, because if there is no pled collusion there can be no misstatement here.  But I think that goes to their answer on why, assuming they get past the first prong of the 10b-5 case, they get on to the second.  And, again, your Honor, it kind of assumes the answer, assumes that there was something that could have been found, should have been found.

When you get to the scienter aspect of this case, the thing that strikes me the most is -- usually scienter comes from CWs, confidential witnesses, in these type of cases.  Not always.

Here, we have seven, two of whom weren't even employed by the client during the relevant time period, and none of the other five have any allegation that they were even meeting with the defendants -- the direct individual defendants or had any knowledge of what top of the house was doing, coupled with the absence of the other traditional hallmarks of scienter: Insider sales; so none of these defendants are alleged to have sold; or some sort of economic motive separate from the general good of the corporation and the benefit of the shareholders.

So I think you've hit on the one thing they answer on

the scienter but, again, it's a conclusionary, would have, could have, should have, if it was there they must have known. But that, again, that doesn't come anywhere close to the pleading standard.

THE COURT:  Do you have any legal authorities for your argument that speculation on the outcome of an investigation cannot be corrective?

MR. YOUNGWOOD:  Just one second, your Honor.

(Pause)

THE COURT:  Take your time.

MR. YOUNGWOOD:  Your Honor, this may not hit directly on your question, and I believe we'll certainly look further into it on full motion.  But for an example, for the proposition that government investigations alone do not constitute or provide grounds for scienter, I mean companies get subpoenas and investigations all the time, that doesn't constitute sufficient evidence of scienter.  I'll just point to one case, that so holds, the Lipow v. Net1 UEPS Technologies, which is 131 F.Supp. 3d 144.  That may not directly -- I acknowledge that may not directly answer I think the slightly narrower question you asked.

THE COURT:  What about on the issue of loss causation?

MR. YOUNGWOOD:  As your Honor pointed out, they allege two corrective disclosures.  The second one, let's talk about that one first, the second one concerns the statements by the

j7V9MICC

Chinese authority regarding the status of the investigation but it's a disclosed investigation.  It's something that the company -- it was already out there in the press, already out there in the public and so now it's a continuation of an investigation without a result as of the pleading of this complaint.  And so I say it's basically more of the same.  The company never tried to -- there is no allegation the company tried to hide the investigation so you have further developments.

As to the first of the two alleged corrective disclosures, which your Honor asked plaintiffs' counsel about, if that's an alleged materialization of the risk, it's not pled.  That's not the theory that's pled in the complaint.  I think what came out in early September, really it was not an allegation of a -- or a statement or evidence about an undisclosed conspiracy.  It was about the market in general. So it -- the second one, at least, has something to do with the theory of the case but I think it's flawed because it's just a continuation of a government investigation.  The first one I don't think has anything to do with the theory of the case.

THE COURT:  When did Micron disclose the existence of the investigation?

MR. YOUNGWOOD:  June 1, 2018.  Which is effectively -- so on June 1, your Honor, June 1, 2018, Micron disclosed that the China state administration for market regulation had

visited its offices on May 31, 2018.  So they disclosed it I don't know the time zone changes but effectively within a day.

THE COURT:  Anything further?

MR. YOUNGWOOD:  No, your Honor.

THE COURT:  Mr. Crowell, in light of the discussion we've had would you like to add anything further?

MR. CROWELL:  Yes, your Honor.  Just a few quick points.

First of all, there are specific allegations about the competitor's ability to increase capacity.  So in May of 2018, so this is the same month that China's regulators raided Micron, Samsung and SK hynix -- so the other two competitors, the big three -- announced that they would be spending $35 billion to increase manufacturing capabilities.

So it's unclear what could have changed between -- at that point except for the fact that Chinese regulators were taking action and taking collusion, price increases very seriously.

As to the supply discipline statements, we have specific statement by Micron's CEO and we say that -- we don't do chapter and verse what the other two competitors were saying, but we do allege that they specifically also stated that they would maintain capacity growth to be below demand growth and that -- we argue that is sufficient detail at this point, especially given that the other two are not defendants

j7V9MICC

in this case.

And then finally, the statement at the end of the class period where the chief regulator -- not just some lower level person or leak -- the chief antitrust regulator makes a public statement saying that they have collected massive evidence that substantiates collusive conduct.  I would argue that it's a lot more meaningful than defendants would argue and certainly is much more substantive than just the disclosure of an investigation.  And given -- well some may argue the capacity of a lot of regulators, regulators of certain countries, that is a highly notable event and certainly the market thought so as well and drove down the price of the stock.

THE COURT:  I think these arguments need to be fleshed out further in a full motion.

When would you like to file your motion, Mr. Youngwood?

MR. YOUNGWOOD:  Your Honor, would the first Friday in September be OK?  I would have said thirty days but that would fall right at the end of August.

THE COURT:  That's fine.  September 6.

MR. YOUNGWOOD:  That would be fine.

THE COURT:  Mr. Crowell, how much time would you like to interpose an opposition?

MR. CROWELL:  Thirty days is adequate, your Honor.  I

j7V9MICC

didn't bring my physical calendar with me.

THE COURT:  October 7.

MR. CROWELL:  Yes, your Honor.  That should be fine.

THE COURT:  Any reply by October 18.

I'll set this matter down for oral argument on November 8 at 10 o'clock.

Will that be convenient for you, Mr. Crowell?  You're coming the greatest distance.  What time of day is easiest for you?

MR. CROWELL:  10 a.m. is fine, your Honor.  Thank you for asking.

THE COURT:  All right.  10 a.m. it is then.  Anything further?

MR. CROWELL:  No, your Honor.

MR. YOUNGWOOD:  Thank you, your Honor.

THE COURT:  I'll enter a scheduling order with these dates.  Thank you very much.  Have a good afternoon.

(Adjourned)